UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Christopher W. Madel, | Case No. 13-cv-02832 (PAM/FLN) |
| Plaintiff, | **Declaration of Christopher W. Madel Pursuant to Federal Rule of Civil Procedure 56(d) and in Opposition to Defendants' Motion for Summary Judgment** |
| v. | |
| United States Department of Justice and Drug Enforcement Administration, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Christopher W. Madel, hereby make the following Declaration under penalty of perjury. The subject of this Declaration and the statements set forth herein are true and correct to the best of my belief on the basis of personal knowledge.

1.      I am the Plaintiff in the above-captioned proceeding before this Court. I make this Declaration pursuant to Federal Rule of Civil Procedure 56(d) and in opposition to Defendants' Motion for Summary Judgment.

2.      I previously submitted a Declaration in the matter on March 20, 2014. [Doc. 39.] For ease of reference, I have included summaries of relevant information included in that first declaration below, along with updated information specific to Defendants' instant Motion for Summary Judgment.

1

**November 2012 and February 2013 FOIA Requests**

3.      On November 20, 2012, I sent a Freedom of Information Act ("FOIA") request, via U.S. mail, to the United States Department of Justice ("DOJ") and the Drug Enforcement Administration ("DEA") (collectively, "Defendants"), seeking access to specific data which I had reason to believe resides in the Automation of Reports and Consolidated Orders System (ARCOS) database maintained by DEA. Specifically, I requested:

1. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding Cardinal Health, Inc.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that Cardinal Health, Inc. distributed the oxycodone to, and the quantity of oxycodone that Cardinal Health, Inc. distributed to that person (in dosage units and grams).

2. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding CVS Caremark's distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that CVS Caremark distributed the oxycodone to, and the quantity of oxycodone that CVS Caremark distributed to that person (in dosage units and grams).

3. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding Walgreen Co.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that Walgreen Co. distributed the oxycodone to, and the quantity of oxycodone that Walgreen Co. distributed to that person (in dosage units and grams).

4. For each month (or quarter) and year since January 1, 2007, reports ## 1, 2, 3, 4, 5, 6, and 7 from the ARCOS–2 [Automation of Reports

and Consolidated Orders System] database (in dosage units and grams). The identity and substance of these reports can be found at http://deadiversion.usdoj.goc/acros/retail_drug_summary/2006/index.html.

5. I sent a subsequent FOIA request on February 5, 2013, via U.S. mail, seeking access to specific additional data which I had reason to believe resides in the ARCOS-2 database. Specifically, I requested:

1. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding AmerisourceBergen Corp.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that AmerisourceBergen Corp. distributed the oxycodone to, and the quantity of oxycodone that AmerisourceBergen Corp. distributed to that person (in dosage units and grams).

2. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding McKesson Corp.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that McKesson Corp. distributed the oxycodone to, and the quantity of oxycodone that McKesson Corp. distributed to that person (in dosage units and grams).

**The Ongoing Oxycodone Epidemic in Georgia**

6. In my previous Declaration, I included a copy of an article published on January 31, 2014 in Georgia Health News, titled "Drug Thefts Rising After Georgia's Pill Mill Crackdown," written by Andy Miller. I included this as one example of an article describing the oxycodone problem that is sweeping the United States in general, and Georgia in particular. (*See* 3/20/14 Madel Decl. ¶ 6, Ex. A [Doc. 39].) According to that article, the "abuse of opioid painkillers is a major national problem" and "Georgia

3

became a pill mill magnet after neighboring states, including Florida, passed tougher laws regulating pain clinics." (*Id*.) The article also stated that "[p]er capita prescription sales of oxycodone in Georgia tripled between 2000 and 2010, the Wall Street Journal reported last year." (*Id*.)

7. My previous Declaration also included a copy of a Drug Enforcement Administration ("DEA") March 5, 2014 press release titled, "Operation 'Double Down Doc' Indictment Exposes Gulf Coast Prescription Drug Ring" and a copy of an identical Department of Justice ("DOJ") March 5, 2014 press release. (*See* 3/20/14 Madel Decl. ¶ 9, Ex. B [Doc. 39].) According to the DOJ and DEA press releases, Operation "Double Down Doc" targeted three Mississippi residents and a Georgia doctor for distributing large quantities of oxycodone in Mississippi. (*Id*.) In the same press release, the DOJ and DEA quote United States Attorney Gregory K. Davis as saying, "Prescription drug abuse is a troubling problem in this country. This office along with our law enforcement partners will continue to investigate and bring to justice those individuals who would illegally distribute highly addictive painkillers." (*Id*.)

8. The opioid epidemic continues today, both nationally and in the state of Georgia. Attached hereto as Exhibit 1 is a true and correct copy of an article published on November 20, 2016 in the Wall Street Journal, titled "U.S. Attorney Preet Bharara Sets His Sights on Drug Dealers in Opioid Overdoses," written by Nicole Hong. This article illustrates the nation's "growing opioid epidemic." According to the article, "opioid overdoses have almost quadrupled since 1999" making them "the No. 1 cause of accidental death in the U.S."

9. There continue to be arrests and criminal charges brought in relation to the prescription of opioids in Georgia, including the prescription of oxycodone. Attached as Exhibit 2 is a true and accurate copy of an article published on May 18, 2016 in the Atlanta Journal-Constitution, titled "Riverdale psychiatrist charged with murder, over-prescribing pain meds," written by Rhonda Cook. The article details the arrest of Georgia psychiatrist Narendra Nagareddy for prescribing "addictive drugs like Oxycodone, Hydrocodone, Fentanyl and Methadone 'outside the normal practice' or for non-medical reasons." Nagareddy, nicknamed "Dr. Death," was known as the "go-to physician for prescription drug addicts" and is being charged with the deaths of three former patients who died of overdoses.

10. Attached as Exhibit 3 is a true and accurate copy of an article published on January 25, 2016 in the Sun Sentinel, titled "Pill mill ringleader from Broward gets prison for running Georgia clinics," written by Paula McMahon. According to the article, Anthony Licata "operated several pill mill pain clinic in the Atlanta area" and served as the ringleader of a conspiracy "that involved several other suspects, including doctors who illegally wrote prescriptions." Licata's clinics "provided highly addictive prescription drugs, including oxycodone and morphine, to phony 'patients' and street drug dealers who had no legitimate medical need for the drugs."

11. The opioid epidemic continues to plague the nation, with opioid-related deaths on the rise. Attached as Exhibit 4 is a true and accurate copy of an article published on March 29, 2016 in Georgia Health News, titled "Obama, visiting Atlanta, calls for bigger anti-drug commitment," written by Andy Miller. According to the article,

"the prescription opioid and heroin overdose epidemic in the United States killed more than 28,000 people in 2014, more than in any other year on record. Overdoses have quadrupled since 2000." As the article highlights, Georgia is especially affected by the opioid epidemic and is "among 14 states that have seen significant increases in the rate of drug overdose deaths."

12. Attached as Exhibit 5 is a true and accurate copy of an article published on January 1, 2016 by the Center for Disease Control and Prevention, titled "Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014," written by Rose A. Rudd, MSPH; Noah Aleshire, JD; Jon E. Zibbell, PhD; and R. Matthew Gladden, PhD. This article illustrates the severity of the opioid problem. According to the article, since 2000, there has been "a 200% increase in the rate of overdose deaths involving opioids." In 2014, the rate of drug overdose deaths involving natural and semisynthetic opioids (e.g., morphine, oxycodone, and hydrocodone) was "highest among opioid overdose deaths."

13. Attached as Exhibit 6 is a true and accurate copy of an article published in June 2016 by the Department of Health and Human Services, titled "The Opioid Epidemic: By the Numbers." According to the article, "[m]ore people died from drug overdoses in 2014 [the most recent year on record] than in any year on record, and the majority of drug overdose deaths (more than six out of ten) involved an opioid."

**Public Benefit of Disclosure of Information Sought by FOIA Requests**

14.     As I explained in my first Declaration [Doc. 39], I do not intend to use the information that I am seeking in a way that would inflict competitive harm on the submitters.

15.     I continue to be willing to submit to a court order that prohibits me from providing the requested information to anyone other than law enforcement. (*See id.*)

**DEA Has Publicly Disclosed Information that is Nearly Identical to the Information that I Seek Regarding Oxycodone Distribution in Georgia**

16.     Attached as Exhibit 7 is a true and accurate copy of a document that I also submitted with my first declaration (*see* Doc. 39, Ex. D). This document was "Attachment J" to the February 24, 2012 declaration of DEA Administrator Michele M. Leonhart in *Cardinal Health Inc. v. Holder et al.*, Civil Action No. 12-cv-185 [Docs. 21-4 and 21-14] (D.D.C. Feb. 24, 2012).

17.     "Attachment J" is a spreadsheet, the source of which is "ARCOS," listing the oxycodone sales, in dosage units, made by Cardinal Health's Lakeland, Florida facility to displayed pharmacies.

18.     Among other things, "Attachment J" displays each buyer's DEA number, each buyer's name, the strength of the oxycodone sold, and the number of sales to each buyer by month and year.

**Additional Information Regarding Defendants' Refusal to
Segregate Information is still needed to satisfy their Burden**

19.     After three years of litigating this matter, I am still waiting for information from Defendants including what they describe as "massive spreadsheets" containing

7

information about Walgreens's, Cardinal Health's, AmerisourceBergen's, and McKesson's distribution of oxycodone in the State of Georgia. Specifically, I want to know what information in those spreadsheets is segregable and why Defendants are unable to provide any segments of information.

20. On April 21, 2015, the U.S. Court of Appeals for the Eighth Circuit issued an Order stating that Defendants had not provided sufficient information to justify their purported inability to segregate and disclose certain information without disclosing everything.

21. Even though Defendants have now submitted a second Myrick Declaration as well as the Lantz and Zagami Declarations, I still have not received sufficient information to justify Defendants' withholding of entire spreadsheets.

22. Among other things, I understand that neither Defendants' brief, nor any of the Declarations they submitted, addressed the disclosure of Cardinal Health information in "Attachment J," an issue that was directly raised in the Eighth Circuit's Order. *See Madel v. United States DOJ*, 784 F.3d 448, 454 (8th Cir. 2015).

23. I am requesting that the Court deny Defendants' Motion for Summary Judgment and order Defendants to produce all reasonably segregable information. I am also requesting that the Court allow discovery that is narrowly tailored to assess the basis for Defendants' continued withholding of any of the remaining requested information.

24. Specifically, Defendants have not yet adequately explained:

  a. Why they are unable to produce only data for distributions of oxycodone over 100,000 dosage units—amounts exceeding what I understand is the

    average oxycodone distribution level to Georgia pharmacies in 2015 by about 400%;

b. Why they are unable to produce data for older years, such as 2006-2012, even though they are not producing data for 2012-2016;

c. How the submitters would be harmed by providing only certain rows of information;

d. How the submitters would be harmed by providing certain columns of information;

e. How the submitters would be harmed by providing headings of the rows and columns;

f. How the submitters would actually suffer competitive harm by the release of portions of spreadsheets (i.e., incomplete spreadsheets) that would not allow for estimates of market share; and

g. What reasoning would allow the DEA to publicly disclose nearly identical information in court filings but refuse to do so in response to my FOIA requests.

25. I recognize that Defendants have mentioned most of these items in the Myrick, Lantz, and Zagami Declarations. However, they have provided only vague responses and conclusory justifications. I still do not know the answer to any of the above questions.

26. Discovery on these issues is necessary to understand why Defendants are unwilling to provide any of the above information.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Minneapolis, Minnesota, this 22nd day of November, 2016.

*s/Christopher W. Madel*
Christopher W. Madel
