1          UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                            )
      Christopher W. Madel,                 )    File No. 13-CV-2832
4                                           )              PAM/FLN)
               Plaintiff,                   )
5                                           )    St. Paul, Minnesota
      v.                                    )    December 14, 2016
6                                           )    9:00 a.m.
      U.S. Department of Justice and        )
7     Drug Enforcement                      )
      Administration,                       )
8                                           )
               Defendants.                  )
9     ------------------------------------------------------------

10          BEFORE THE HONORABLE PAUL A. MAGNUSON
                 UNITED STATES DISTRICT COURT JUDGE
11                    **(MOTIONS HEARING)**

12    **APPEARANCES**
       **For the Plaintiff:**          **ROBINS KAPLAN, LLP**
13                                     **JENNIFER ROBBINS, ESQ.**
                                       **AMIRA ELSHAREIF, ESQ.**
14                                     800 LaSalle Ave, #2800
                                       Minneapolis, Minnesota 55402
15
       **For the Defendants:**         **UNITED STATES ATTORNEY'S OFFICE**
16                                     **PAMELA MARENTETTE, AUSA**
                                       300 S. 4th St., #600
17                                     Minneapolis, Minnesota 55415

18     Court Reporter:                 DEBRA BEAUVAIS, RPR-CRR
                                       300 S. 4th St., #1005
19                                     Minneapolis, Minnesota 55415

20

          Proceedings recorded by mechanical stenography;
21    transcript produced by computer.

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1   THE LAW CLERK:  All rise.  United States District

2   Court for the District of Minnesota is now in session, the

3   Honorable Paul A. Magnuson presiding.

4   Please be seated.

5   THE COURT:  Good morning.  We have the matter of

6   Madel v. DOJ.  Welcome back.  Ms. Marentette.

7   MS. MARENTETTE:  Good morning, Your Honor.

8   THE COURT:  Tell me why you should have summary

9   judgment.

10   MS. MARENTETTE:  Again, good morning.  I know it's

11   a busy day for the Court and since the Court is familiar

12   with this case, I plan to discuss some higher-level concepts

13   that relate to the segregability requirements and respond to

14   any of the Court's questions you may have, Your Honor.  I

15   may reserve a little additional time for rebuttal, if

16   possible.

17   As the Court is aware, we're dealing with four

18   spreadsheets that defendants have withheld in full.  Those

19   spreadsheets detail every transaction by four different

20   distributors of oxycodone over a seven-year period.  It

21   discloses the identity of the distributor, the identity of

22   the buyer, the location of the buyer, and the amounts of

23   oxycodone, and the dates, and that type of specific

1    information.  We're here specifically to talk about

2    segregability.  I just wanted to emphasize, again, the words

3    explicit in the statute that it is a reasonable

4    segregability requirement.  The statute does not require in

5    every instance that a portion of a record that is not

6    covered by an exemption be disclosed.  And we're looking at

7    the specific facts and circumstances of these documents and

8    with relation to our exemption for concerns which has to --

9         THE COURT:  Well, it was certainly important

10   enough to get the attention of the circuit.

11        MS. MARENTETTE:  It was.  It was, Your Honor.  You

12   know, and with regret we are back here for this one narrow

13   issue.  Fortunately, we couldn't --

14        THE COURT:  Well, I'm not so sure that we are

15   because our good friends on the fifth floor, they use that

16   issue that Mr. Madel put on the last page of his reply brief

17   but he used to send it back, but they sent the whole nine

18   yards back.

19        MS. MARENTETTE:  Well, Your Honor, I would

20   disagree that they sent everything back.  The Eighth Circuit

21   agreed with Your Honor that Exemption 4 does apply to these

22   records but questioned whether the record supported that

23   there wasn't any reasonably segregable part of those records

24   and asked the agency to provide more information on that

25   point, which I believe we have in the declaration of Kathy

1    Myrick, the second declaration as well.  And we have two

2    declarations from two of the submitter companies.

3    Additional information for the other two are incorporated

4    into Ms. Myrick's declaration that talks about why those

5    different portions of the spreadsheets, the different

6    columns of data, are competitively sensitive, as well as why

7    even if there are a few columns that may not be exempt why

8    those columns would be inextricably intertwined such that

9    there would not be a requirement to segregate in this case.

10          In particular, I think this case is somewhat

11   unique in that we normally have a set of discrete documents

12   we're looking at, narrative documents, where we might have a

13   paragraph here that is exempt, a paragraph there that is not

14   or even a chapter that is or a chapter that is not in some

15   sort of report that we're dealing with.  Here we have

16   something a little different where we have columns of data

17   that are interacting, and it's that interaction that

18   produces the competitive concern.  It's identifying the

19   distributor with the buyer with the volume of oxycodone on

20   specific dates that allows these competitors to get a

21   complete list of a sales record and of their list of buyers.

22   So when we look at how we redact that, it may be technically

23   possible to simply redact down to just disclose, for

24   example, Cardinal Health.  Just disclosing Cardinal Health

25   may be an option.  However, that wouldn't be a reasonable

1      requirement here.  It really wouldn't provide Mr. Madel with

2      any information.  He already knows Cardinal Health is a

3      distributor of oxycodone.  It would be -- as some of the

4      cases we've cited in our opening and reply briefs, it would

5      be futile, it would provide no additional information.  So

6      the Myrick declaration that we now have on our docket here,

7      as well as the submitters, have argued that really all of

8      this information, all of these columns -- all of these

9      transactions, all of these columns are competitively

10     sensitive and should not be redacted.  But even if we take

11     an assumption that there may be some discrete columns,

12     discrete fields that we could isolate, it really wouldn't

13     provide any information of any value.  I know that Mr. Madel

14     has argued that that's the agency taking the position of

15     judging what's valuable to him, but we looked specifically

16     at his request that wanted -- he wants the identification of

17     the distributor, and their buyer, and the amount of the

18     transaction, and that's exactly what we would have to

19     disentangle and redact in order to deal with the Exemption 4

20     concern.  You know, so fundamentally I think we're looking

21     at an issue that the information is inextricably

22     intertwined.

23             I think as applied from the *Missouri Coalition*

24     case -- that's the Eighth Circuit case that we're looking at

25     primarily that sets our standard for the level of detail we

1        need to provide the Court on segregability and also whether

2        the documents are reasonably segregable, which we argue that

3        they are not.

4               I also want to point out to the Court that

5        specifically with some categories of information Mr. Madel

6        has requested -- the large transactions -- the companies

7        have informed the agency and have informed the Court and the

8        record that releasing that information could compromise the

9        company's anti-diversion efforts.  That would allow people

10       who are interested in diversion to understand how much

11       oxycodone is moving to certain buyers at certain points in

12       time.  So that is a concern that I wanted to bring to the

13       Court's attention.

14              I wanted to briefly address -- and maybe the Court

15       has questions on these issues, too -- plaintiff's arguments

16       with respect to the ARCOS Report 1 that is on the agency's

17       website now, as well as the summary chart from the *Cardinal*

18       *Health* suspension case that both parties address in this

19       motion.  What I want to distinguish is the issue of

20       segregability and whether a document is segregable and a

21       separate issue under FOIA, which is waiver, whether the

22       publication of information -- or whether the information is

23       already public has waived the agency's ability to assert an

24       exemption.  I think what we're dealing with when we're

25       talking about ARCOS Report 1 being public or the Cardinal

1    Health information being public is really an issue of

2    waiver.  And the law on that is that the agency really is

3    only waiving its ability to usurp the exemption when it's

4    the identical document that has been made public.  It's part

5    of a public domain doctrine that the D.C. Circuit has dealt

6    with on a variety of occasions.  And the idea is that once

7    the identical document is public, enforcing the exemption

8    really doesn't have any effect anymore because the public

9    already has that information.  But we don't have that

10   identical information.  The four spreadsheets we're dealing

11   with here are significantly more detailed and, again, go

12   through thousands and thousands -- hundreds of thousands of

13   entries relating to every single transaction.  And what

14   we're dealing with with ARCOS Report 1 is more summary data.

15   And the *Cardinal Health* suspension data as well is a summary

16   chart that isn't identical to what we're dealing with.  So

17   under that waiver doctrine we argue that that does not apply

18   here and it doesn't interact or defeat the agency's

19   demonstration that the four spreadsheets are not reasonably

20   segregable.

21          Before I sit down, I will point out I think we

22   have met our burden in providing detail to support why these

23   spreadsheets should be withheld in full with particular

24   respect to older transactions, larger transactions,

25   individual columns of data, and why there's no reasonably

1    segregable portion.  Certainly if the Court disagrees, the

2    proper course, we argue, is that we are happy to provide the

3    Court with more detailed information.  While normally I

4    would not encourage an in-camera review of withheld records

5    because often that's very burdensome for the Court --

6         THE COURT:  You've got that right.

7         MS. MARENTETTE:  -- in this case it is an option I

8    think we could consider because it could be done with one

9    page.  The spreadsheets are very lengthy, but the

10   information is repetitive so that one page of a sample of a

11   spreadsheet that the Court could look at -- this is only if

12   the Court feels it's warranted; and, again, we argue we

13   think we have met our burden without any additional effort

14   here, but I do suggest just because this case is a little

15   different and if we do need to be practical because we've

16   reached that point, I think we could have the Court take a

17   look at just one page in camera and that would resolve any

18   remaining issue the Court might have with whether the

19   document should be redacted.

20        THE COURT:  How about the fact that you've already

21   released a bunch of this information, put it on your

22   website?  Didn't bother to tell Mr. Madel, but you did it.

23        MS. MARENTETTE:  Right.  I understand the Court

24   would have a concern about that because I did, too, when I

25   learned about it.  That was the point I was discussing

1     earlier, this ARCOS Report 1.  So the original request was

2     for a series of these summary reports that DEA puts together

3     with the same information that the four spreadsheets from

4     the companies -- that that data is compiled in a variety of

5     ways.  The reports that were already up online were ones

6     that were very desegregated, you know, distributions by

7     state where you really could never tell who the submitters

8     of the information were, who their customers were.  ARCOS

9     Report 1 was something DEA withheld originally when we came

10    to you with this case originally.  And the reason that the

11    DEA took that position at the time was that the data is

12    broken down by zip code.  It still doesn't say who the

13    companies are or who their buyers are, but it's broken down

14    by zip code.  And you can essentially possibly reverse

15    engineer to get that information, because some of these

16    places are really rural.  You can take a small area and

17    realize there's only one pharmacy in that zip code and you

18    can figure out and back up to who is getting what amount of

19    oxycodone.  So that's why that was originally withheld.

20          The agency made a public policy decision to

21    publish that data.  Again, this data is used for the agency

22    to fulfill its mission in regulating controlled substances.

23    And that's something that as soon as the decision was made I

24    wish I would've known to be able to tell plaintiff.  I

25    didn't know.  It was just the decision got made here and

1    over here (indicating) was the attorney handling the FOIA

2    case, and I was in my office over here in Minneapolis.  As

3    soon as we discovered it, we told Mr. Madel as soon as I

4    knew.  I e-mailed him to let him know.  But, again, because

5    the information is different than what we have, it's not the

6    same information than what we have in the four withheld

7    spreadsheets, again, I argue that that is an issue of waiver

8    under FOIA and fits within that framework, not

9    segregability.  And there wouldn't be waiver here because

10   it's a different document.  It's actually plaintiff's burden

11   on a waiver argument to demonstrate that they are identical.

12   The data we're dealing with is far more detailed and

13   discloses precisely the distributor and each of their buyers

14   on the different dates of the transactions.

15            THE COURT:  Okay.  Thank you very much.

16            MS. MARENTETTE:  Thank you.

17            THE COURT:  Ms. Robbins.

18            MS. ROBBINS:  Good morning, Your Honor.

19            So it seems to me that, based on all of the

20   information that we have now been provided, what we have

21   here are actually more questions rather than fewer, two

22   areas of which raise genuine issues of material fact for us:

23   the first being the adequacy of the segregability analysis

24   that was undertaken by SARF, and the second area being the

25   genuine issue of material fact as to whether SARF and DEA

1    are actually engaging in good faith in conducting that

2    analysis.

3             And the things that I will bring up -- and I

4    should say, first of all, our argument related to ARCOS

5    Report 1 and also to the Cardinal Health disclosures is not

6    a waiver argument.  I can see why defendants are attempting

7    to place it into the bucket of waiver in that that shifts

8    the burden.  But we bring those to Your Honor's attention

9    more as indicative of the problems with the rationale that

10   apparently SARF used in determining segregability in the

11   first place, second place, and third place.

12            So at three different times over the course of the

13   years of this case, Mr. Madel was told absolutely not, ARCOS

14   Report 1 is too competitively sensitive, we can't even

15   segregate out any earlier years from 2006 moving forward.

16   He was told that initially January 1, 2014, a year after he

17   had issued his request.  He was told that again in February

18   of 2014; most recently said again in October, on October 8th

19   of 2015:  nope, that cannot be segregated and we will not

20   provide that information to you.

21            One thing about SARF to remember, too, is that the

22   chief of that division in charge of FOIA is also responsible

23   under the statute with communicating with the rest of DEA

24   and the head of DEA, as well as the Attorney General, in

25   terms of how they're proceeding under their withholding

1     arguments and just generally the positions that the agency

2     is taking.  The fact that the agency with three months after

3     the last time we were told that, no, in fact that report

4     cannot be disclosed to you in any way -- no portion of it in

5     fact -- the fact that three months later the agency would

6     make such a drastic change in decision and also that,

7     apparently, that information didn't filter its way into

8     either SARF or to DOJ counsel, that indicates to me a

9     substantial issue in terms of not only the analysis that was

10    conducted by SARF, because clearly if it's so competitively

11    sensitive and DEA would later decide in fact, no, we can

12    publish it and go broader than your request in terms of time

13    frame and data, that to me indicates that there is a

14    question as to both the analysis that was conducted and also

15    as to the good faith in terms of the time frame and the

16    amount of time that we have been having to push the same

17    issue only to be told, oh, nine months ago it was actually

18    released online.  And then similarly the analysis is

19    questioned by the fact that these Cardinal Health charts

20    were disclosed.  And those four charts indicate at the

21    bottom there that they are source data from ARCOS.  That is

22    the same date that we've requested.  I'm not arguing that

23    the data is identical; it's obviously not.  It's related to

24    Florida.  But what I am saying is that when it appears that

25    that data is helpful to the DEA to disclose, that then they

 1     will do so.  And when it's not helpful to the DEA or when

 2     SARF is not communicating with the DEA as required by FOIA

 3     that we are told as a requester that, no, none of that

 4     information like this is possible to receive.  That again

 5     brings into question, I think, the whole good-faith effort

 6     here and also the delay and the analysis itself.

 7              So those are our -- I mean, our main questions

 8     about those documents is really just to point out the

 9     changes in position that have gone on here with no

10     explanation, and then also just why is this happening when

11     the declarations that are being submitted now indicate that,

12     well, AmerisourceBergen -- the response from them was

13     summarized as, you know, in the time frame historical data

14     is always confidential.  There's no end time?  What does

15     that mean?  I mean, that we can never ever receive any

16     information that would relate to Amerisource?  And is there

17     no critical thinking that's going to go into SARF analysis

18     in looking at the submitter's objections and determining is

19     there actually a competitive harm and not just a competitive

20     harm, but a substantial likelihood of competitive harm?

21     That time frame issue is out there.  It is real.  The fact

22     that these submitters are objecting to any disclosure of any

23     information no matter what the time frame is, I find that to

24     be slightly incredible in that in any other civil-litigation

25     case we would be pushing back.  There would be an argument

1   to be made that they would have to justify why exactly

2   information from a decade ago is just as confidential and

3   sensitive as information that is from last year.  And is

4   there not a way to then sort out the data from just one year

5   and not provide the rest?  We don't know that.  If this is

6   all information that's contained in spreadsheets -- today is

7   the first day I found out that, apparently, we can redact

8   just Cardinal Health.  I don't know if that means the name

9   Cardinal Health and we're actually provided the rest of the

10  information or if that means redact everything related to

11  Cardinal Health.  I don't know what that means.  And that's

12  the point of the discovery that we're requesting at this

13  place.

14          So there are allegations that we are now making

15  based on the facts in this case that there is a genuine

16  issue of material fact as to good faith.  These summaries,

17  the declarations, and affidavits, they are not sufficient to

18  make a decision at this point about whether segregation is

19  possible under any of these items:  dosage, units, time

20  frame or anything like that.

21          Sorry, I thought Your Honor was going to say

22  something.

23          And so we are asking for discovery.  It is

24  limited.  I would envision starting with interrogatories and

25  perhaps a deposition.  I'm not asking for the ability to

1    invade an agency's pre-decisional ideas, but what I am

2    asking is what are the facts that underline this rationale?

3    Is there any more communication that they actually had with

4    the submitters that would actually explain why it is that

5    2006 data is just as competitive as 2015 data and we cannot

6    receive any part of it.  That's where we are with our case.

7         And truth be told, again, this is a situation

8    where we're talking about an opioid epidemic, and people are

9    dying, and we are --

10        THE COURT:  Well, all you have to do is pick up

11   the newspaper for that subject.

12        MS. ROBBINS:  Right.  So the idea that we are

13   going to allow the government to hide behind the exemptions

14   here without actually answering the questions about why it

15   is that none of this can be separated from the rest in a

16   spreadsheet that can probably be sorted we still don't know.

17   There's been no answer for that either.  And so to me, I

18   think there are genuine issues of material fact that remain.

19        With that said, we would also ask Your Honor to

20   grant our declaratory judgment that this is a violation of

21   FOIA, that this ongoing dispute, that the delay, and all of

22   the battles that we've had to undertake here against the

23   government in this case, that that is sufficient.  There is

24   no mootness at this point.  We are entitled to declaratory

25   judgment in our favor on this.

1      I'm happy to answer any questions that Your Honor

2  has.  I mean, the amount of things that have changed over

3  the last ten years in the healthcare arena just makes me

4  question the validity of these consistent blanket objections

5  from the submitters and our willingness to just go along

6  with them without further questions.

7      THE COURT:  Well, on the declaratory judgment,

8  that's just premature at this point.  I'm not about to do

9  that.

10      Okay.  Anything else?

11      MS. ROBBINS:  No.  Thank you, Your Honor.

12      THE COURT:  Okay.  Ms. Marentette.

13      MS. MARENTETTE:  I think I'll work backwards.

14      First, with respect to discovery -- and our brief

15  is clear on this -- there is no basis for it that they have

16  demonstrated.  The case law is clear that discovery when

17  it's granted -- and it's rarely granted -- is limited to

18  inquiring into the propriety of the search on the index of

19  information that's been withheld, and that's not the type of

20  thing that they are looking for.  What they are looking for

21  is information about why these documents aren't reasonably

22  segregable, which we're discussing right now.  So if the

23  record is incomplete -- again, we don't think that it is; we

24  think there's plenty of information in there that explains

25  the issues that Ms. Robbins is asking about -- but the

1    course that should be taken this Court has taken before, is

2    seeking more information from the agency or perhaps in this

3    one limited circumstance taking a look at a section of the

4    spreadsheet so the Court can make a more informed

5    determination of whether the record is robust enough to

6    grant the motion.

7              I want to just point out that in our reply brief

8    on page 4 and 5 we provide just a couple of examples of why

9    the declarations are specific to the concerns Ms. Robbins is

10   concerned about.  With historical data the companies have

11   said it's not just that it's competitive always.  They've

12   talked about the fact that they have had the same customers

13   all along for some of these companies.  So to disclose

14   historical data means you're still disclosing all the stuff

15   of potentially their current customers, and that's the

16   concern that they have there.

17             And there are many, many other examples in

18   addition to what we've provided in our reply brief that

19   states with specificity why certain portions of the

20   spreadsheet -- just quantities of oxycodone by themselves

21   are sensitive.  When I was mentioning before an example of

22   potentially just redacting down to revealing just the name

23   Cardinal Health, I wasn't saying you could redact and

24   disclose all the other stuff.  I was trying to give a basic

25   example of why these spreadsheets aren't reasonably

1    segregable.  We'd have to take out all of the stuff

2    Mr. Madel wants.  We'd have to take out the identity of the

3    buyers, their locations, the amounts of oxycodone, the dates

4    of transactions.  We're left with at best a row of column

5    headers.  We're left with perhaps the name Cardinal Health,

6    the name Walgreens.  We already know that.  It doesn't

7    provide any additional information.  Is it something the

8    agency technically could do?  And, of course, if we're

9    ordered to do, we'll do it, but it's futile and it's not

10   required under the case law that speaks to this inextricably

11   intertwined exemption to segregability.  That's what I was

12   trying to say before.  And if I was unclear, I hope I've

13   just cleared that up.

14        I also want to discuss -- I understand very much

15   the concerns about ARCOS Report 1.  I think it's regrettable

16   that the information didn't get to plaintiff earlier, but I

17   do not think that that reflects on the good faith of the

18   agency.  To the best of my knowledge -- and I've asked these

19   questions quite sternly of my client -- it was simply a lack

20   -- there should've been communication.  It's a large agency.

21   It just didn't happen.  It wasn't anybody trying to hide

22   anything.  The communication just didn't make it in a timely

23   fashion.  So we regret that, but I'm standing here on record

24   to say that I do not think that there was any bad faith in

25   how that happened.

 1           I also want to point out that the *Cardinal Health*

 2    matter was a suspension case.  This data exists so that DEA

 3    can intervene timely to make sure that there is no diversion

 4    of these very dangerous pharmaceuticals, and that's what

 5    Mr. Madel says he's trying to help with.  The fact that the

 6    agency used four pages of a summary chart in that case is

 7    very different from a FOIA case to which we have a different

 8    regulation.  We have to notify submitters when there's a

 9    FOIA request.  We have exemptions.  And if we do it wrong in

10    FOIA, we get sued by the submitters.  They can bring what's

11    called a reverse FOIA suit under the Administrative

12    Procedure Act and sue us for trying to release the

13    information.  So the FOIA context is somewhat specific.

14    There are specific regulations and steps the agency has to

15    take.  And we invite additional litigation if we're not

16    being careful about our analysis.  And I think the record

17    shows that we have been careful here.

18           Let me just see if I have anything.  If the Court

19    has any questions -- I'm just looking over my notes.  I

20    think that's all I have.

21           The Court already mentioned that the discussion of

22    declaratory judgment is premature.  We are on the same page.

23    But until the Court determines that we've met our

24    obligations under the statute, clearly the Court has

25    jurisdiction.  Our argument is simply that once the Court

1    does make that determination that the case is ended,

2    jurisdiction is ended, and there's no jurisdiction for the

3    Court to additionally enter declaratory relief with respect

4    to timeliness.  Timeliness is an issue that occurs before

5    the -- during the request and then when that first and final

6    response is made.  The fact that the litigation has gone on

7    and gone up to the Eighth Circuit and come back really

8    doesn't have to do with the agency giving a timely FOIA

9    response on the initial part of that.

10         Without any further questions, I can --

11         THE COURT:  Counsel, I'm kind of taken by the

12   suggestion that you've made of just supplying a page to the

13   Court to look at what we're really looking at in the

14   segregability issue.  But I'd like to expand that just a

15   little bit.  I'd like to have you select the page.  It's

16   your page to pick.

17         MS. MARENTETTE:  I actually have one right here,

18   Your Honor, but --

19         THE COURT:  And then I would like to take that

20   page and have you give me a brief on why it's not

21   segregable, just that page.

22         MS. MARENTETTE:  Okay.

23         THE COURT:  But now I want to do something else.

24   I want you to give that page to the plaintiffs, and I want

25   the plaintiffs to give me -- and I'm not talking about an

1    opus on this, I'm talking about a letter -- plaintiffs give

2    me a letter on why it is segregable so I can get down to the

3    very practical core of this because, frankly, that's where

4    I'm struggling.  I see these thousands and thousands and

5    thousands of pages, and I think oh, whoops.  But, on the

6    other hand, I remember years ago when my colleague, Judge

7    Nelson, took me over to a room about this size to show me

8    the tobacco case exhibits.

9           MS. MARENTETTE:  This is not that, Your Honor.

10          THE COURT:  And I realize now that -- and I don't

11   have one up here now, but I realize all of that could've

12   been on a disk this size (indicating).  The world has

13   changed.  And I'm trying to figure out just on a practical

14   level where we are on the segregability issue.  And I think

15   a page like this -- it's a suggestion, I think it's good,

16   but I'd like you guys to take your separate sides on it and

17   let me look at it and try to divine from that.

18          MS. MARENTETTE:  Your Honor, if I could just

19   clarify.  I certainly can provide Your Honor with a

20   full-page sample.  It does contain each detailed

21   transaction.  I could provide the plaintiff that page but

22   redact the actual data of the transactions there.  To give

23   them a full page I feel is then simply disclosing

24   information.

25          THE COURT:  Counsel, I don't know if I have the

1    right to do it, but I'm going to order, number one, that

2    this be submitted under seal.  And I'm going to order that

3    in one page it be released.  And I'm going to order the

4    plaintiffs will never disclose it --

5              MS. MARENTETTE:  Okay.

6              THE COURT:  -- except to the Court.  I think we

7    can do that, and I think we should.  And once I get it all

8    figured out if you want to destroy it all, we can.  I just

9    think as a practical matter we need to look at the whole

10   thing.  Like I say, this is one of those thousands of pages.

11   And I'll let you pick the page.

12             MS. MARENTETTE:  Sure, Your Honor.

13             THE COURT:  You want to pick one for the local

14   buggy whip company that isn't going to be applicable to

15   anything, that's fine with me.  I don't care.

16             MS. MARENTETTE:  I mean, I think with the Court's

17   assurance of that protection, I think it will ameliorate

18   concerns with the submitters.

19             THE COURT:  I am happy to give protection to that.

20   I don't want to in any way throw this on the front page of

21   the Star Tribune.  I just want to really take a practical

22   look at what we have.

23             Okay.  With that I'm going to take the matter

24   under advisement.  The holidays are coming up, but maybe the

25   end of the first week of January or something like that I

1    can get responses from both of you?

2            MS. MARENTETTE:  We can discuss among ourselves an

3    amenable schedule.

4            THE COURT:  Figure it out.  If you can do better

5    than that, why, be my guest.

6            MS. ROBBINS:  Thank you, Your Honor.  That works.

7    And we will, obviously, abide by Your Honor's ruling and

8    will not disclose any of that information.

9            MS. MARENTETTE:  I don't mean to imply a lack of

10   trust, just assurance to my client and the company.

11           THE COURT:  No, I understand, Counsel.

12           MS. MARENTETTE:  Thank you, Your Honor.

13           THE COURT:  Okay.  Thank you.

14           (Court adjourned at 9:30 a.m.)

15                        *     *     *

16           I, Debra Beauvais, certify that the foregoing is a

17   correct transcript from the record of proceedings in the

18   above-entitled matter.

19           Certified by:  s/Debra Beauvais
                             Debra Beauvais, RPR-CRR
20

21

22

23

24

25